Filed 8/4/14

# IN THE SUPREME COURT OF CALIFORNIA

CAROLYN GREGORY, )
)
       Plaintiff and Appellant, )
) S209125
       v. )
) Ct.App. 2/5 B237645
LORRAINE COTT et al., )
) Los Angeles County
       Defendants and Respondents. ) Super. Ct. No. SC109507
_____ )

       The question in this case is whether patients suffering from Alzheimer's disease are liable for injuries they inflict on health care workers hired to care for them at home. Because agitation and physical aggression are common late-stage symptoms of the disease, injuries to caregivers are not unusual. California and other jurisdictions have established the rule that Alzheimer's patients are not liable for injuries to caregivers in institutional settings. We conclude that the same rule applies to in-home caregivers who, like their institutional counterparts, are employed specifically to assist these disabled persons. It is a settled principle that those hired to manage a hazardous condition may not sue their clients for injuries caused by the very risks they were retained to confront.

       This conclusion is consistent with the strong public policy against confining the disabled in institutions. If liability were imposed for caregiver injuries in private homes, but not in hospitals or nursing homes, the incentive for families to institutionalize Alzheimer's sufferers would increase. Our holding does not

preclude liability in situations where caregivers are not warned of a known risk, where defendants otherwise increase the level of risk beyond that inherent in providing care, or where the cause of injury is unrelated to the symptoms of the disease.

We encourage the Legislature to focus its attention on the problems associated with Alzheimer's caregiving. The number of Californians afflicted with this disease can only be expected to grow in coming years. Training requirements and enhanced insurance benefits for caregivers exposed to the risk of injury are among the subjects worthy of legislative investigation.

BACKGROUND

The relevant facts are undisputed. In 2005, defendant Bernard Cott contracted with a home health care agency to assist with his 85-year-old wife and codefendant Lorraine, who had long suffered from Alzheimer's disease. The agency assigned plaintiff Carolyn Gregory to work in the Cotts' home.

Gregory was trained to care for Alzheimer's patients, and had done so in other assignments. She knew they could be violent. Bernard told her Lorraine was combative and would bite, kick, scratch, and flail. Gregory's duties included supervising, bathing, dressing, and transporting Lorraine, as well as some housekeeping. In September 2008, Gregory was washing dishes while Lorraine sat at the kitchen table. Bernard was not at home. As Gregory was washing a large knife, Lorraine approached her from behind, bumped into her, and reached toward the sink. When Gregory attempted to restrain Lorraine, she dropped the knife, which struck her wrist. As a result, Gregory lost feeling in several fingers and experienced recurring pain.

Gregory has received workers' compensation. She also sued the Cotts for negligence and premises liability, with a claim against Lorraine for battery. The trial court granted a defense motion for summary judgment. A divided Court of

2

Appeal affirmed, holding that Gregory's claims were barred by the primary assumption of risk doctrine. We affirm the judgment.

DISCUSSION

Since its reformulation in *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*), California's assumption of risk doctrine has taken two quite different forms. Primary assumption of risk is a complete bar to recovery. It applies when, as a matter of law, the defendant owes no duty to guard against a particular risk of harm. Secondary assumption of risk applies when the defendant does owe a duty, but the plaintiff has knowingly encountered a risk of injury caused by the defendant's breach. Liability in such cases is adjudicated under the rules of comparative negligence. (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067-1068; *Knight*, at pp. 314-315.)

The general duty to avoid injuring others extends to persons "of unsound mind." (Civ. Code, §§ 41, 1714.)[1] Accordingly, Lorraine Cott's Alzheimer's disease does not, per se, diminish the duty she owed to Gregory. To shield themselves from liability, the Cotts rely on the primary assumption of risk doctrine, which operates as an exception to the general duty of care.

Primary assumption of risk cases often involve recreational activity, but the doctrine also governs claims arising from inherent occupational hazards. (*Nalwa*

---

**1** Civil Code section 41 provides: "A person of unsound mind, of whatever degree, is civilly liable for a wrong done by the person, but is not liable in exemplary damages unless at the time of the act the person was capable of knowing that the act was wrongful."

Civil Code section 1714, subdivision (a), provides in part: "Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

3

*v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1155, fn. 1; *Knight*, *supra*, 3 Cal.4th at pp. 309-310, fn. 5.)  The bar against recovery in that context first developed as the "firefighter's rule," which precludes firefighters and police officers from suing members of the public for the conduct that makes their employment necessary. (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 538-540 (*Neighbarger*); see 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 845 et seq., p. 65 et seq.)  After *Knight*, we have viewed the firefighter's rule "not . . . as a separate concept," but as a variant of primary assumption of risk, "an illustration of when it is appropriate to find that the defendant owes no duty of care." (*Neighbarger*, at p. 538.)  Whether a duty of care is owed in a particular context depends on considerations of public policy, viewed in light of the nature of the activity and the relationship of the parties to the activity.  (*Neighbarger*, at p. 541; *Knight*, at pp. 314-315.)

We have noted that the duty to avoid injuring others "normally extends to those engaged in hazardous work."  (*Neighbarger*, *supra*, 8 Cal.4th at p. 536.) "We have never held that the doctrine of assumption of risk relieves all persons of a duty of care to workers engaged in a hazardous occupation."  (*Id.* at p. 538.) However, the doctrine *does* apply in favor of those who hire workers to handle a dangerous situation, in both the public and the private sectors.  Such a worker, "as a matter of fairness, should not be heard to complain of the negligence that is the cause of his or her employment.  [Citations.]  In effect, we have said it is unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront."  (*Id.* at p. 542.)  This rule encourages the remediation of dangerous conditions, an important public policy.  Those who hire workers to manage a hazardous situation are sheltered from liability for injuries that result from the risks that necessitated the employment.

In *Neighbarger*, the plaintiffs were safety supervisors at an oil company. The company had hired an outside maintenance contractor, whose employees negligently injured the plaintiffs. We held that the assumption of risk doctrine did not apply, because there was no contractual relationship between the plaintiffs and the maintenance contractor. "When [a] firefighter is publicly employed, the public . . . stands in the shoes of the person who hires a contractor to cure a dangerous condition. In effect, the public has purchased exoneration from the duty of care and should not have to pay twice, through taxation and through individual liability, for that service." (*Neighbarger*, *supra*, 8 Cal.4th at pp. 542-543.) A privately employed safety employee, however, has no such relationship with a third party contractor. The contractor has not "paid in any way to be relieved of the duty of care . . . . Having no relationship with the employee, and not having contracted for his or her services, it would not be unfair to charge the [contractor] with the usual duty of care towards the private safety employee." (*Id*. at p. 543.)

The defendant in *Neighbarger* relied on "veterinarian's rule" cases, in which veterinarians or their assistants were held to have assumed the risk of being bitten by dogs during treatment. (*Neighbarger*, *supra*, 8 Cal.4th at pp. 544-545, citing *Cohen v. McIntyre* (1993) 16 Cal.App.4th 650, *Willenberg v. Superior Court* (1986) 185 Cal.App.3d 185, and *Nelson v. Hall* (1985) 165 Cal.App.3d 709.) We noted, however, that the veterinarian's rule does not support applying assumption of risk "when the defendant is a third party who has not secured the services of the plaintiff or otherwise entered into any relationship with the plaintiff." (*Neighbarger*, at p. 545.)

We took up the veterinarian's rule in *Priebe v. Nelson* (2006) 39 Cal.4th 1112 (*Priebe*). There, a worker in a veterinary kennel sued the owner of a dog that bit her. We noted that the veterinarian's rule was recognized in *Neighbarger* and *Knight* as "yet another application of the doctrine of primary assumption of risk."

5

(*Priebe*, at p. 1122, citing *Neighbarger*, *supra*, 8 Cal.4th at pp. 544-546, and *Knight*, *supra*, 3 Cal.4th at p. 309, fn. 5.) We concluded that the plaintiff, "by virtue of the nature of her occupation as a kennel worker, assumed the risk of being bitten or otherwise injured by the dogs under her care and control . . . ." (*Priebe*, at p. 1132.)

The *Priebe* opinion identifies several policy rationales for the veterinarian's rule. The most fundamental is rooted in the very nature of the profession. When an owner entrusts a dog to the care of trained professionals, the owner is no longer in charge. The professional determines how best to manage the animal, and is in the best position to take protective measures against being bitten. (*Priebe*, *supra*, 39 Cal.4th at pp. 1129-1130.) A second basis for the rule is the contractual relationship between the parties. The defendant has retained the plaintiff for services that necessarily include the safe handling of the dog. (*Id*. at pp. 1130-1131.) A third reason, and one that justified extending the veterinarian's rule to kennel workers, is the social utility of allowing owners to place their dogs in kennels without the risk of liability. "Encouraging the use of secure kennel boarding facilities . . . serves the salut[a]ry purpose behind the dog bite statute — that of protecting members of the public from harm or injury by dogs not properly under their owners' control . . . ." (*Id*. at p. 1131.)

The case most closely on point here is *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761, 1770-1772 (*Herrle*), decided after *Neighbarger* and before *Priebe*. The plaintiff, a certified nurse's aide at a convalescent hospital, was struck and injured by an Alzheimer's patient while moving the patient from a chair to bed. The parties agreed that violent behavior is a common symptom of Alzheimer's disease. The hospital had many such patients, and the plaintiff was trained to work with them. (*Herrle*, at p. 1764.) The Court of Appeal observed that the situation precisely matched the contours of primary assumption of risk, as

6

outlined in *Knight*: " 'the nature of the activity' was the protection of the patient from doing harm to herself or others; 'the parties' relationship to the activity' was plaintiff's professional responsibility to provide this protection, [and] the 'particular risk of harm that caused the injury' was the very risk plaintiff and her employer were hired to prevent." (*Herrle*, at p. 1765, quoting *Knight*, *supra*, 3 Cal.4th at pp. 314-315.)

The plaintiff contended that assumption of risk was not an available defense because mentally incompetent persons are liable for their torts under Civil Code section 41. The court disagreed, reasoning that "section 41 is intended to place the incompetent person in the same posture as the competent person, not in a legally worse position. Where no duty exists in the first place, section 41 does not create one. Competent persons can avail themselves of the doctrine of primary assumption of risk. Likewise the defense is available to the incompetent. Here, plaintiff, by the very nature of her profession, placed herself in a position where she assumed the duty to take care of patients who were potentially violent and to protect such patients from committing acts which might injure others. The danger of violence to the plaintiff was rooted in the ' " ' " 'very occasion for [her] engagement.' " ' " ' [Citations]. This is not a case of a person suffering from senile dementia who gets in a car and causes an accident." (*Herrle*, *supra*, 45 Cal.App.4th at p. 1766.)

*Herrle* distinguished an early case, *Mullen v. Bruce* (1959) 168 Cal.App.2d 494, in which a patient hospitalized with delirium tremens was found liable for injuring a nurse. (*Id*. at pp. 495-496.) The *Mullen* court declined to hold as a matter of law that the plaintiff had assumed the risk of her injuries. Her actual knowledge of the danger and reasonable opportunity to safely avoid it were questions of fact, decided in her favor at trial. (*Id*. at p. 498.) *Herrle* pointed out that *Mullen* was decided under an outdated theory of assumption of risk. Under

the modern doctrine, as explained in *Knight* and *Neighbarger*, the defendant may be held to owe no duty of care in the first place, as "a legal conclusion based on the relationship between the parties." (*Herrle*, *supra*, 45 Cal.App.4th at p. 1767.)

The *Herrle* court reviewed decisions from Florida and Wisconsin concluding that institutionalized mental patients were not liable for injuries inflicted on their caretakers. (*Herrle*, *supra*, 45 Cal.App.4th at pp. 1768-1770, discussing *Anicet v. Gant* (Fla.Dist.Ct.App. 1991) 580 So.2d 273, 277 [insane patient], *Mujica v. Turner* (Fla.Dist.Ct.App. 1991) 582 So.2d 24, 25 [Alzheimer's patient], and *Gould v. American Family Mut. Ins. Co.* (Wis. 1996) 543 N.W.2d 282, 287 [Alzheimer's patient].) The analysis in *Gould* was particularly consistent with California's primary assumption of risk doctrine. The Wisconsin Supreme Court reasoned that the injured nurse who sought recovery "was not an innocent member of the public," but a person "employed as a caretaker specifically for dementia patients." (*Gould*, at p. 286.) The patient's "disorientation and potential for violence [was] the very reason he was institutionalized and needed the aid of employed caretakers." (*Id.* at p. 287) Although "ordinarily a mentally disabled person is responsible for his or her torts," the relationship of such a person with an "employed caretaker" justifies an exception to the rule. (*Ibid.*; see *Herrle*, at p. 1769.) The *Herrle* court deemed *Gould* "remarkably congruent" with the analysis in *Neighbarger*, because it found that "the basic relationship between the Alzheimer's patient and his employed caretaker 'justifies exonerating' the patient 'from the usual duty of care.' " (*Herrle*, at p. 1770, quoting *Neighbarger*, *supra*, 8 Cal.4th at p. 543.)

*Herrle* concluded that public policy favors exempting patients from liability to health care providers "for injuries inherent in the very condition for which treatment was sought." (*Herrle*, *supra*, 45 Cal.App.4th at p. 1770.) "When the relationship between health care providers and health care recipients is considered,

8

the idea that a patient should be liable for 'conduct' part and parcel of the very disease which prompted the patient (or, as here, the patient's family) to seek professional help in the first place becomes untenable. It is the health care provider, not the patient, who is in the best position to protect against the risks to the provider rooted in the very reason for the treatment. Were we to reach a contrary conclusion, . . . risks most efficiently allocable to and traditionally borne by the health care industry would be shifted to individual patients and their families." (*Id.* at pp. 1770-1771.)

The plaintiff in *Herrle* relied on *Neighbarger* to argue that the firefighter's rule should not be extended to bar recovery by a private employee. (*Herrle*, *supra*, 45 Cal.App.4th at p. 1771.) The court rejected the argument. *Neighbarger* recognized that a private contractor " 'hired to remedy a dangerous situation . . . , as a matter of fairness, should not be heard to complain of the negligence that is the cause of his or her employment.' " (*Herrle*, at p. 1772, quoting *Neighbarger*, at p. 542.)[2] The defendant in *Herrle*, through her relatives, had arranged for the plaintiff's services. Thus, unlike the *Neighbarger* defendant, she had "paid to be relieved of a duty of care." (*Herrle*, at p. 1772.) Given the relationship of caregiver and patient, "it would be unfair to . . . impose on defendant the very duty of care which she had contracted for plaintiff to supply." (*Ibid*.)

As the *Herrle* court recognized, primary assumption of risk in its occupational aspect is readily applicable to the relationship between hired

---

[2] The *Herrle* court might have noted that one of the cases cited in *Neighbarger* on this point was *Anicet v. Gant*, *supra*, 580 So.2d 273, an action for injuries inflicted by a mental patient on a hospital attendant. *Anicet* held that "no *duty* to refrain from violent conduct arises on the part of a person who has no capacity to control it to one who is specifically employed to do just that." (*Id.* at p. 277; see *Neighbarger*, *supra*, 8 Cal.4th at p. 542.)

9

caregivers and Alzheimer's patients. It was stipulated in *Herrle* that violent behavior is a common symptom of the disease, and that proposition is well supported by medical texts,[3] legal commentary,[4] and the facts of reported cases.[5]

[3] "With moderately severe [neurocognitive disorder due to Alzheimer's disease], psychotic features, irritability, agitation, combativeness, and wandering are common." (Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) p. 612.) "Behavioral disorganization may be characterized by wandering, agitation, hostility, uncooperativeness, or physical aggression." (The Merck Manual (17th ed. 1999) Delirium and Dementia, ch. 171, p. 1397 [Alzheimer's Disease].)

[4] "[T]he patient may exhibit severe mood and personality changes. He or she may also be physically aggressive or may become easily agitated." (James, *No Help for the Helpless: How the Law Has Failed to Serve and Protect Persons Suffering from Alzheimer's Disease* (2012) 7 J. Health & Biomedical L. 407, 408, fn. omitted.) "Alzheimer's . . . results in persons becoming disoriented, frustrated, and sometimes combative." (Dark, *Tort Liability and the Unquiet Mind* (2004) 30 T. Marshall L.Rev. 169, 203.) "[I]n slowly progressive dementias such as Alzheimer's disease, decisional incapacity develops gradually and unpredictably . . . . Physical aggression, . . . delusions, and hallucinations present ethical and legal challenges that are not present in most diseases." (Rabins, *Dementia and Alzheimer's Disease: An Overview* (2001) 35 Ga.L.Rev. 451, 458.) "Some [patients] are combative and dangerous to those around them when they get confused or disoriented, and some become consistently violent. This takes a great toll on caregivers . . . ." (Richards, *Public Policy Implications of Liability Regimes for Injuries Caused by Persons with Alzheimer's Disease* (2001) 35 Ga.L.Rev. 621, 639.)

[5] In addition to *Herrle*, *supra*, 45 Cal.App.4th at page 1764, see *Berberian v. Lynn* (N.J. 2004) 845 A.2d 122, 123 (Alzheimer's patient became increasingly agitated and assaultive toward hospital staff; hospital had "standard patient aggression policy" for those with dementia); *Creasy v. Rusk* (Ind. 2000) 730 N.E.2d 659, 669 (patient "regularly displayed behaviors characteristic of a person with advanced Alzheimer's disease such as aggression, belligerence, and violence"); *Colman v. Notre Dame Convalescent Home, Inc.* (D.Conn. 1997) 968 F.Supp. 809, 810 (patient with "senile dementia" repeatedly attacked recreational therapist); *Gould v. American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at page 283 (Alzheimer's patient "was often disoriented, resistant to care, and occasionally combative"); *Mujica v. Turner*, *supra*, 582 So.2d at page 24 (physical therapist injured in "melee" with Alzheimer's patient).

It follows that the risk of violent injury is inherent in the occupation of caring for Alzheimer's patients.[6]  While many such patients never become violent, it is equally true that not all fires injure firefighters, and not all dogs bite veterinarians. Nevertheless, because the *risk* of injury from those causes is inherent in the occupations of firefighters and veterinarians, it is settled that no duty is owed to protect them from the very dangers they are hired to confront.  (*Priebe*, *supra*, 39 Cal.4th at p. 1122; *Neighbarger*, *supra*, 8 Cal.4th at p. 542.)  *Herrle*'s conclusion that Alzheimer's patients owe no duty of care to protect hired caregivers from the risk of injury has found support, and no disagreement, in other jurisdictions. (*Berberian v. Lynn*, *supra*, 845 A.2d at p. 129; *Creasy v. Rusk*, *supra*, 730 N.E.2d at p. 667; *Colman v. Notre Dame Convalescent Home, Inc.*, *supra*, 968 F.Supp. at p. 813; see 1 Dobbs et al., The Law of Torts (2d ed. 2011) § 237, p. 854.)

Gregory does not claim that *Herrle* was wrongly decided.  She urges instead that its rationale should not be applied to Alzheimer's caregivers employed *in private homes*.  She contends the home environment lacks the specialized equipment and trained health care professionals found in institutions.  Thus, she argues, in-home caregivers cannot be said to be "in the best position to protect against the risks to the provider rooted in the very reason for the treatment." (*Herrle*, *supra*, 45 Cal.App.4th at p. 1770.)  Gregory notes that she was not a certified health care professional, and asserts that Lorraine was not her "patient." She points out that unlike the plaintiff in *Herrle*, she was not caring for her client

---

[6]    "Judges deciding inherent risk questions under *Knight* may consider not only their own or common experience with the . . . activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment."  (*Nalwa v. Cedar Fair, L.P.*, *supra*, 55 Cal.4th at p. 1158.)

11

at the time of her injury, but instead was engaged in housekeeping. Accordingly, Gregory maintains that primary assumption of risk should not bar her suit, and her claims should instead be analyzed under the secondary assumption of risk doctrine.

Secondary assumption of risk, however, is predicated on the existence of a duty. "The first question is whether the defendant has breached a duty to the plaintiff. The duty analysis depends on the nature of the activity . . . and the parties' relationship to it. (*Knight*, [*supra*, 3 Cal.4th] at p. 308.)" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 498.) It is only when "it has been established that a duty has been breached, however that duty is appropriately defined under the circumstances of the case, [that] the general principles of comparative fault are applied to assign *liability* in proportion to the parties' respective fault." (*Id.* at pp. 498-499.)[7] On the fundamental question of duty, Gregory's attempts to distinguish home health care workers from those employed in institutions are not persuasive. In each setting, caring for patients with Alzheimer's dementia is the "nature of the activity." Caregivers are hired to protect the patients from harming themselves or others. If a patient injures a caregiver by engaging in the combative behavior symptomatic of Alzheimer's disease, the "particular risk of harm that caused the injury" was among the very risks the caregiver was hired to prevent. (*Knight*, at pp. 314-315; see *Herrle*, *supra*, 45 Cal.App.4th at p. 1765.)

---

[7] Our concurring colleague opines that there would be little difference in the result if secondary assumption of risk were applied. But that is not the case. Gregory's tort claims would present triable issues, and the matter of her own comparative fault would also have to be litigated under secondary assumption of risk. Primary assumption of risk, turning as it does on the legal question of duty, is particularly amenable to resolution by summary judgment. (*Nalwa v. Cedar Fair, L.P.*, *supra*, 55 Cal.4th at p. 1162; see *Knight*, *supra*, 3 Cal.4th at p. 315.)

12

Gregory's claim that caregivers in private homes face higher risks and have fewer risk management tools than institutional caregivers is entirely speculative. It might be that institutions, which house larger numbers of potentially dangerous patients, are riskier than private homes, where the caregiver may develop familiarity with one patient's proclivities. The record here sheds no light on the question. The reported cases reflect many more instances of injury to employees caring for Alzheimer's patients in institutions than to in-home caregivers. Institutional health care workers were the plaintiffs in *Berberian v. Lynn*, *supra*, 845 A.2d at page 123, *Creasy v. Rusk*, *supra*, 730 N.E.2d at page 661, *Colman v. Notre Dame Convalescent Home, Inc.*, *supra*, 968 F.Supp. at page 810, *Herrle*, *supra*, 45 Cal.App.4th at page 1764, *Gould v. American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at page 283, and *Mujica v. Turner*, *supra*, 582 So.2d at page 24. Only one case other than Gregory's has involved injury in a private home, and that injury was not the result of violence. In *Vinccinelli v. Musso* (La.Ct.App. 2002) 818 So.2d 163, the patient spilled ice cream, on which the caregiver slipped and fell. The court drew no distinction because the injury occurred in a home. It relied on cases arising in institutional settings to conclude that the patient owed no duty to the employee whose contractual duty it was to care for her. (*Id*. at pp. 166-167.) Gregory fails to establish that in-home caregivers face appreciably higher risks than those employed in institutions.

Gregory contends that primary assumption of risk should not bar recovery by an in-home worker who is not a certified health care professional. She notes that the plaintiff in *Herrle* was a certified nurse's aide. However, Gregory does not explain how certification affects the legal question of duty. Primary assumption of risk is analyzed in terms of function, not formality. Volunteer firefighters assume the risk of injury just like their officially employed counterparts. (*Neighbarger*, *supra*, 8 Cal.4th at p. 544; *Baker v. Superior Court*

13

(1982) 129 Cal.App.3d 710, 717-718.) The same is true of veterinarian's assistants and their credentialed employers. (*Priebe*, *supra*, 39 Cal.4th at pp. 1129-1130; *Nelson v. Hall*, *supra*, 165 Cal.App.3d at pp. 714-715.)

The duties of the plaintiff in *Herrle* were quite similar to those performed by Gregory. The dissent noted that the plaintiff's "duties, for which she was paid not much more than minimum wage, included changing bedpans, helping the elderly to and from their beds, and assisting them in feeding and dressing themselves." (*Herrle*, *supra*, 45 Cal.App.4th at p. 1773, dis. opn.) If we were to apply a different rule to uncertified in-home caregivers, employees attending to multiple institutionalized Alzheimer's patients would be deemed to have assumed the risk of injury, while those performing the same duties for single patients in private homes would not. The logic and the fairness of that outcome are not evident.

We acknowledge that Gregory is not a doctor or a nurse. However, it is her occupation to care for Alzheimer's patients. We do not hold that *anyone* who helps with such patients assumes the risk of injury. The rule we adopt is limited to professional home health care workers who are trained and employed by an agency.[8] Although Gregory now claims the training she received from her employer was insufficient, she expressed no reservations about the adequacy of her training in her deposition testimony. In any event, the important consideration is that Bernard Cott contracted with an agency that promised to provide him an aide trained to manage his wife's condition. By doing so, he paid to be relieved of a duty to protect the aide from the very risks she was retained to encounter.

---

[8] We have no occasion here to consider the policy implications of claims by other hired caregivers.

(*Neighbarger*, *supra*, 8 Cal.4th at pp. 542-543; *Herrle*, *supra*, 45 Cal.App.4th at p. 1772.) Certification and minimum training requirements for such workers are subjects suitable for legislative consideration.

Gregory does not contend that the level of her compensation is relevant to the primary assumption of risk analysis. However, as amici curiae, unions representing home health care workers argue that their low rate of pay makes it inequitable to apply the firefighter's rule to their occupation. They point out that firefighters are rewarded for their dangerous work with special pay and benefits. The dissent below, like the *Herrle* dissent, makes the same point. However, this factor has never been determinative, as cases applying the firefighter's and veterinarian's rules demonstrate.

"Although cases often cite the special benefits and compensation that firefighters and police officers receive as one reason underlying the firefighter's rule, no case has held that receipt of or eligibility for those benefits is a requirement for application of the firefighter's rule. On the contrary, cases have concluded receipt of special compensation or benefits is not a requirement for application of the rule. (*Hodges v. Yarian* (1997) 53 Cal.App.4th 973, 983; *Neighbarger*, *supra*, 8 Cal.4th at p. 544; *Baker v. Superior Court*[, *supra*,] 129 Cal.App.3d 710, 717-718.) In *Baker*, volunteer firefighters who were paid a mere $5 per call for firefighting were barred from maintaining personal injury actions because the firefighter's rule applied. (*Baker*, *supra*, at pp. 717-718; *Neighbarger*, *supra*, at p. 544.)" (*City of Oceanside v. Superior Court* (2000) 81 Cal.App.4th 269, 284.) "It was not the amount of public compensation that was determinative in *Baker* . . . but the relationship between the public and the firefighters who serve it." (*Neighbarger*, at p. 544; see *City of Oceanside*, at p. 285 [inadequate compensation did not preclude application of firefighter's rule to lifeguards].)

In *Priebe*, *supra*, 39 Cal.4th 1112, the plaintiff was a " 'kennel technician' " who had been working "for about four weeks." (*Id*. at pp. 1117-1118.) Her duties included " 'feeding, walking, cleaning, laundry, helping hold animals, [and] assisting the veterinarians and the technicians holding animals.' " (*Id*. at p. 1117.) There was no mention of special compensation. Nevertheless, we held that the plaintiff assumed the risks associated with caring for dogs. (See also *Nelson v. Hall*, *supra*, 165 Cal.App.3d 709, where the plaintiff was a veterinarian's assistant.)

Gregory suggests she was as much a housekeeper as a caregiver, and emphasizes that she was injured while washing dishes, not directly attending to Lorraine. If Gregory had been retained as a housekeeper, primary assumption of risk would not bar her action because she would not have been hired to manage the risks posed by Lorraine's dementia. But Gregory worked for a home health care agency, not a housekeeping service. The circumstance that her duties included some housekeeping does not alter the central reason for her employment: Lorraine's inability to care for herself due to Alzheimer's disease. This fact establishes their relationship as caregiver and patient, and supports the application of primary assumption of risk. It is undisputed that Gregory's duties included constant supervision of Lorraine, to protect not only Lorraine but also Bernard and Gregory herself.

Gregory argues that Bernard should be held liable for failing to install restraining devices and mirrors to facilitate observation and prevent Lorraine from catching others by surprise. However, courts are ill equipped to prescribe safety standards. Were we to allow recovery on this ground, families who retain caregivers for Alzheimer's patients would have little guidance as to which devices and modifications might be sufficient to avoid liability in their particular situation. This is not to say that Bernard owed no duty of care to Gregory relating to

16

conditions in the home. Under the firefighter's rule, recovery is not barred when the injury was caused by factors *independent* of the activity that required the plaintiff's presence.[9] Accordingly, the Cotts as homeowners would be liable to Gregory for torts unrelated to Lorraine's Alzheimer's disease, including those involving a dangerous condition of their property.

In general, primary assumption of risk does not bar recovery when the defendant's actions have unreasonably *increased* the risks of injury beyond those inherent in the activity. (*Nalwa v. Cedar Fair, L.P.*, *supra*, 55 Cal.4th at p. 1162, citing cases.) If Bernard had done or failed to do something that elevated Gregory's risk of injury, this limitation on the doctrine would apply. But, having hired Gregory to care for Lorraine, Bernard owed Gregory no duty to protect her from the ordinary risks that arose in the course of that employment. Gregory claims she was not specifically warned that Lorraine might approach her from behind while she was washing dishes. It is true that a defendant who misrepresents or hides a hazardous condition is subject to liability. (*Priebe*, *supra*, 39 Cal.4th at p. 1115; *Lipson v. Superior Court* (1982) 31 Cal.3d 362, 371.) Gregory, however, claims no deception by Bernard. She concedes that he informed her of Lorraine's combative tendencies. No advisement can reasonably be required to anticipate every variation of circumstance in which a disclosed risk might develop.

---

**9** E.g., *Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 663 (firefighter was not barred from recovery for slip and fall on wet stairs during safety inspection); *Kocan v. Garino* (1980) 107 Cal.App.3d 291, 292-293 (police officer in hot pursuit of suspect could sue for injuries caused by negligently maintained fence). See *Neighbarger*, *supra*, 8 Cal.4th at page 538; 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 855-856, pages 77-80.

17

Gregory also contends that intentional conduct does not come within the scope of primary assumption of risk, so that her battery claim against Lorraine should survive. Determining Lorraine's intent when Gregory was injured, or indeed the intentions of any late-stage Alzheimer's patient, is an uncertain enterprise. In any event, whether "intentional" or not, violent conduct by such patients is an inherent aspect of the caregiving function, and therefore within the scope of the assumed risk. (Cf. *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 164-166 [being intentionally hit by pitch is inherent risk in baseball].)

The assaultive conduct in *Herrle*, and the other cases involving institutionalized Alzheimer's patients, could be characterized as "intentional." Nevertheless, the courts held that the patients owed no duty to protect the plaintiffs from the behavior that was the reason for their employment.[10] Absence of duty

---

[10]     In *Herrle*, *supra*, 45 Cal.App.4th at page 1764, the patient "struck plaintiff about the head several times causing serious jaw injuries." In *Berberian v. Lynn*, *supra*, 845 A.2d at page 124, the plaintiff extended her hand to help the patient to his room, but he "grabbed plaintiff's hand, pulled her toward him and then pushed her back, causing her to fall and fracture her right leg." In *Creasy v. Rusk*, *supra*, 730 N.E.2d at page 661, the patient was " 'hitting and kicking wildly' " as nursing assistants tried to put him to bed, during which time he kicked the plaintiff " 'several times in [her] left knee and hip area.' " In *Gould v. American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at page 283, the plaintiff "attempted to redirect [the patient] to his own room by touching him on the elbow," and he "responded by knocking her to the floor." In *Mujica v. Turner*, *supra*, 582 So.2d at page 24, the plaintiff "tried to take a bathrobe sash from the [patient] who was . . . attempting to strangle herself to death"; the patient "pushed the . . . plaintiff in the ensuing melee, causing the latter to fall and injure herself."

An anomalous result was reached in *Colman v. Notre Dame Convalescent Home, Inc.*, *supra*, 968 F.Supp. at page 810. The plaintiff, a recreational therapist, was playing her guitar for convalescent home residents when the patient "wrestled the guitar away from plaintiff and used it to beat her on the head. . . . Approximately two months later, . . . [the patient] again attacked plaintiff, causing her to lose her balance and fall." In a memorandum opinion, the district court

*(footnote continued on next page)*

bars recovery for intentional torts as well as for negligence. "A tort, whether intentional or negligent, involves a violation of a *legal duty*, imposed by statute, contract, or otherwise, owed by the defendant to the person injured." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 6, pp. 48-49; see *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8.)[11]

There is an argument, though Gregory does not explicitly make it, that liability should be imposed to encourage the institutionalization of patients who develop violent tendencies. Public policy, according to this view, is served by isolating the dangerously demented to minimize the threat they pose. We note, first, that the incentive to institutionalize is not entirely removed by the rule we

_____

*(footnote continued from previous page)*

barred the negligence claim, relying on *Herrle*, *supra*, 45 Cal.App.4th 1761, *Gould v. American Family Mutual Insurance Co.*, *supra*, 543 N.W.2d 282, and *Mujica v. Turner*, *supra*, 582 So.2d 24, to conclude that "although a mentally disabled adult ordinarily is responsible for injuries resulting from her negligence, no such duty of care arises between an institutionalized patient and her paid caregiver." (*Colman*, at p. 814.) However, the court denied summary judgment on the plaintiff's battery claim, considering itself bound by a Connecticut Supreme Court decision holding insane persons liable for intentional torts. (*Id.* at p. 811, citing *Polmatier v. Russ* (1988) 537 A.2d 468, a wrongful death action against a paranoid schizophrenic defendant who killed his father-in-law.) The latter aspect of *Colman*'s holding is unpersuasive. *Polmatier* was inapposite, and the court gave no consideration to the "no duty" rule in connection with the battery claim.

[11] Gregory invokes the limitations on the firefighter's rule imposed by Civil Code section 1714.9, but that statute applies only to peace officers, firefighters, and emergency medical personnel. (§ 1714.9, subd. (a).) In any event, the only statutory exception that might arguably apply would be that for intentional injury. (§ 1714.9, subd. (a)(3).) As explained above, to the extent an injury inflicted by an Alzheimer's patient on a caregiver may be deemed "intentional," it is within the assumed risks of the caregiver's employment. The inherent risks of the occupations covered by section 1714.9, even that of peace officer, do not include assaultive conduct by a person for whom they are specifically hired to care.

19

adopt. As a general matter, Alzheimer's patients and their families are liable under Civil Code section 41 for the injuries they inflict. Our holding bars recovery by only one class of plaintiffs: those employed to care for the patient. We also note that institutionalization is not an effective solution to the problem of injury to caregivers in general; as we have seen, it is not uncommon for Alzheimer's patients to injure employees in institutions.[12]

Most importantly, however, the idea that tort liability should be imposed to encourage placing the mentally disabled in institutions is inconsistent with the modern policy preference for keeping these patients in their homes whenever possible. (See Note, *Rejecting the Logic of Confinement: Care Relationships and the Mentally Disabled Under Tort Law* (1999) 109 Yale L.J. 381.) Support for institutionalization can be found in older cases. But the public policy disfavoring institutional confinement of the mentally disabled has gained strength in recent years, and legislatures have taken measures aimed at keeping patients in their homes.

The case law reflects these developments. The prevailing view in the older cases was that hired caregivers did *not* assume the risk of injury by their insane patients, whether at home or in institutions. (*McGuire v. Almy* (Mass. 1937) 8 N.E.2d 760, 763 [nurse did not assume risk of assault by insane person during violent episode in home]; *Van Vooren v. Cook* (N.Y.App.Div. 1947) 75 N.Y.S.2d

---

**12**    The dissenting opinion does not grapple with this aspect of the problem. It would saddle families with liability for injuries to caregivers as a cost of the decision to keep a patient at home, while leaving injured institutional caregivers without remedy, except for workers' compensation. We believe it is more equitable to treat caregivers the same in both settings, allowing families to make the difficult decision of where to care for the patient without considerations of liability shadowing their deliberations.

362, 366 [attendant in mental hospital did not invite assault by patient]; *Mullen v. Bruce*, *supra*, 168 Cal.App.2d at pp. 497-498 [assumption of risk by nurse in convalescent hospital resolved against patient at trial]; *Burrows v. Hawaiian Trust Company* (Hawaii 1966) 417 P.2d 816, 821-822 [nurse assumed risk of injury in home only if it was preventable by exercise of due care, or if hazard was unreasonably accepted].)

The law permitting recovery by caregivers began to change in 1991, when the Florida District Court of Appeal held that a mental patient owed no duty to the hospital attendant he injured. (*Anicet v. Gant*, *supra*, 580 So.2d at p. 276.) The court relied primarily on the considerations underlying the firefighter's rule, but also reasoned that patients' families should be exempt from liability *because* they had done as much as they could to protect the public from harm by confining the patient in an institution. (*Ibid.*) The latter rationale was mentioned in two subsequent cases, *Gould v. American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at page 287, and *Colman v. Notre Dame Convalescent Home, Inc.*, *supra*, 968 F.Supp. at page 813.

In 2000, the Indiana Supreme Court recognized the conflict between modern attitudes toward disability and the idea that confinement brings protection against liability. In *Creasy v. Rusk*, *supra*, 730 N.E.2d 659, a nursing assistant in a health care facility was injured by an Alzheimer's patient. The court acknowledged that those with mental disabilities are generally held to the usual standard of care to avoid injuring others, but concluded that public policy and the nature of the relationship between a professional caregiver and a mentally disabled patient justifies an exception to the ordinary rule. (*Id.* at pp. 667-668.) However, the court expressly refrained from "endorsing the incentives for confinement" that arise from outdated views of the benefits of institutionalization. (*Id.* at p. 668.)

21

The *Creasy* court observed: "Since the 1970's, Indiana law has strongly reflected policies to deinstitutionalize people with disabilities and integrate them into the least restrictive environment. National policy changes have led the way for some of Indiana's enactments in that several federal acts either guarantee the civil rights of people with disabilities or condition state aid upon state compliance with desegregation and integrationist practices. [Citations.]" (*Creasy v. Rusk*, *supra*, 730 N.E.2d at pp. 664-665, fn. omitted, citing Indiana statutes.) "It is clear . . . that contemporary public policy has rejected institutionalization and confinement for a 'strong professional consensus in favor of . . . community treatment . . . and integration into the least restrictive . . . environment.' Indeed, scholarly commentary has noted that 'new statutes and case law . . . have transformed the areas of commitment, guardianship, confidentiality, consent to treatment, and institutional conditions.' " (*Creasy v. Rusk*, *supra*, 730 N.E.2d at p. 666, fns. omitted, citing, inter alia, Note, *Rejecting the Logic of Confinement: Care Relationships and the Mentally Disabled Under Tort Law*, *supra*, 109 Yale L.J. at p. 390.)

California law also strongly disfavors institutionalizing those with mental disabilities, including the elderly. The Legislature has provided for the licensure of "home health agencies" to provide residential services (Health & Saf. Code, § 1727 et seq.), with an eye toward "preventing, postponing, and limiting the need for unnecessary institutionalization." (Health & Saf. Code, § 1727.7, subd. (a)(1).)[13] "It is the intent of the Legislature to ensure that the department licenses and certifies home health agencies in a reasonable and timely manner to ensure

---

**13**    It is unclear whether Gregory's employer is such a licensed home health agency.

that Californians have access to critical home- and community-based services. . . . Home health agencies help the state protect against the unnecessary institutionalization of individuals and are integral in ensuring the state's compliance with the United States Supreme Court decision in Olmstead v. L.C. (1999) 527 U.S. 581, which requires public agencies to provide services in the most integrated setting appropriate to the needs of qualified individuals with disabilities." (Health & Saf. Code, § 1728.8, subd. (a).) [14]

The Legislature also expressed a policy preference for minimizing the institutionalization of the elderly and disabled when it passed the California Adult Day Health Care Act. (Health & Saf. Code, § 1570 et seq.) "The Legislature hereby finds and declares that there exists a pattern of overutilization of long-term institutional care for elderly persons or adults with disabilities, and that there is an urgent need to establish and to continue a community-based system of quality adult day health care which will enable elderly persons or adults with disabilities to maintain maximum independence. While recognizing that there continues to be a substantial need for facilities providing custodial care, overreliance on this type of care has proven to be a costly panacea in both financial and human terms, often traumatic, and destructive of continuing family relationships and the capacity for independent living.

---

**14** *Olmstead v. L.C.*, *supra*, 527 U.S. at page 607, holds that under the Americans with Disabilities Act (42 U.S.C. § 12132), "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."

"It is, therefore, the intent of the Legislature in enacting this chapter and related provisions to provide for the development of policies and programs that will accomplish the following:

"(a) Ensure that elderly persons and adults with disabilities are not institutionalized inappropriately or prematurely.

"(b) Provide a viable alternative to institutionalization for those elderly persons and adults with disabilities who are capable of living at home with the aid of appropriate health care or rehabilitative and social services." (Health & Saf. Code, § 1570.2.)

Like the Indiana Supreme Court, we are reluctant to subscribe to a rationale that would encourage the confinement of Alzheimer's patients in institutions. California public policy clearly favors alternative arrangements in which these patients are assisted to remain at home. The contemporary view of institutionalization as a last resort counsels in favor of a rule that encourages families to retain trained home health care workers to supervise and assist late-stage Alzheimer's patients. If families were protected from liability to caregivers only if they place the patient in an institution, the opposite incentive would operate.

After weighing the public policies involved, we agree with those sister-state jurisdictions which have concluded that workers' compensation, rather than tort recovery, is the appropriate means of compensating hired caregivers for injuries caused by Alzheimer's patients. (*Berberian v. Lynn*, *supra*, 845 A.2d at p. 129; *Creasy v. Rusk*, *supra*, 730 N.E.2d at p. 668; cf. *Anicet v. Gant*, *supra*, 580 So.2d at p. 276.) The nature and extent of workers' compensation benefits or other insurance requirements for these caregivers are questions beyond our purview. However, considering the importance of the services they provide, whether in

24

institutions or in private homes, the Legislature may wish to consider those questions.

## DISPOSITION

We affirm the Court of Appeal's judgment.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**

**CONCURRING OPINION BY LIU, J.**

Because Carolyn Gregory's injuries resulted "from the very condition or hazard the defendant has contracted with [her employer] to remedy or confront" (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 542), I agree that her claims are barred under the primary assumption of risk doctrine. (Maj. opn., *ante*, at p. 14 ["[T]he important consideration is that Bernard Cott contracted with an agency that promised to provide him an aide trained to manage his wife's condition. By doing so, he paid to be relieved of a duty to protect the aide from the very risks she was retained to encounter."].) At the same time, it should be apparent from today's opinions that this case raises some difficult issues.

At a doctrinal level, it is not obvious that casting our holding in terms of primary assumption of risk is altogether dissimilar from a finding of summary judgment for the Cotts, on these facts, under the secondary assumption of risk doctrine. I agree that "[o]ur holding does not preclude liability in situations where caregivers are not warned of a known risk, where defendants otherwise increase the level of risk beyond that inherent in providing care, or where the cause of injury is unrelated to the symptoms of the disease." (Maj. opn., *ante*, at pp. 1–2.) Further, "[t]he rule we adopt is limited to professional home health care workers who are trained and employed by an agency." (*Id.* at p. 14.) In light of these caveats, I also agree with Justice Rubin that disputes about these relevant facts will arise in future cases, and such cases will be analyzed under secondary assumption of risk. (Dis. opn., *post*, at pp. 9–10; see *id.* at p. 9 [primary assumption of risk "is

founded on an absence of factual disputes"].) In today's case, the majority and dissent disagree on whether "[t]he relevant facts are undisputed." (Maj. opn., *ante*, at p. 2; compare *id.* at pp. 2, 14, 16 with dis. opn., *post*, at pp. 3–7.) But if one accepts (as I do) the majority's view of the facts, I am not sure the result would be so different whether the doctrinal label is primary or secondary assumption of risk. For if it is "undisputed" that Gregory's injury occurred within the scope of her caregiving duties, that Bernard Cott hired Gregory believing she was adequately trained, and that Bernard suitably warned Gregory, did not deceive her, and did nothing to increase the level of risk beyond that inherent in providing care (maj. opn., *ante*, at pp. 2, 14, 16, 17), then it is not obvious a mere allegation that Bernard should have done more to prevent Gregory's injury would be sufficient to allow this case to go to a jury. Similarly, it is questionable on this record whether the bare allegation of battery against an 85-year-old woman "who had long suffered from Alzheimer's disease" (*ibid.*) presents a triable issue.

This factually cabined approach to applying primary assumption of risk may seem anomalous, since the firefighter's rule and the veterinarian's rule appear to cover broader and more discrete categories of activity. Justice Rubin is correct to say, in light of today's limited decision, "At some point, primary assumption of risk will apply, but what is that point? Does not that inquiry undermine part of the utility of the doctrine of primary assumption of risk?" (Dis. opn., *post*, at p. 10.) But, as Justice Rubin observes elsewhere (*id.* at pp. 5–7), even the firefighter's rule is subject to factual limitations. (See, e.g., *Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 660 [no primary assumption of risk for firefighter who slipped on wet stairs while conducting a fire safety inspection].) Indeed, courts have always had to make factual determinations to decide whether the actors and the source of harm are of a type properly considered under primary assumption of risk. (See, e.g., *Knight v. Jewett* (1992) 3 Cal.4th

2

296, 320 ["a participant in an active sport" owes no duty of care to "other participants" unless his conduct "is so reckless as to be totally outside the range of the ordinary activity involved in the sport"].)  Analytically, today's rule is no different, even if the definition of the activity to which primary assumption of risk applies is more circumscribed.

Ultimately, for me what tips the balance in favor of primary assumption of risk is that the tort system does not appear to be the proper forum for ensuring adequate compensation for on-the-job injuries suffered by home health aides, at least in cases like this one.  The dissent argues that because "the family has extensive, if not exclusive, control" over a private home, "family members should likewise retain liability."  (Dis. opn., *ante*, at p. 3.)  But the dissent does not say what Bernard Cott should have done to mitigate the hazards that his wife's illness posed to Gregory.  Indeed, there is no reason to think that a family member who lives with an Alzheimer's patient does not *already* have every incentive to adopt prudent and reasonable safety measures inside the home, for what happened to Gregory could just as easily have happened to Bernard himself.  How is a family member, a court, or a jury to know, without the benefit of hindsight, what additional modifications or safety devices will be necessary in this kind of situation?  It seems doubtful that a liability rule would do much to improve home safety.  It would more likely saddle ordinary families who are doing their best in difficult circumstances with potential costs they cannot realistically avoid.

At the same time, it is difficult to ignore the compelling public policy interest in ensuring that low-paid home health care workers receive adequate protection.  (See dis. opn., *post*, at p. 12; Cal. Employment Development Dept., Summary Guide for Home Health Aides in California (2014) <http://www.labormarketinfo.edd.ca.gov/OccGuides/Summary.aspx?Soccode=311011&Geography=0601000000> [as of Aug. 4, 2014] [median annual

3

wage in 2014 for home health aides in California was $23,267].)  Applying primary assumption of risk, even when limited to a subset of cases, makes it likely that some home caregivers will face workplace hazards without adequate compensation.  Although we might expect such a rule to decrease the willingness of individuals to serve as home health care workers, thereby raising wages or increasing benefits such as insurance, ordinary labor market behavior may be eclipsed by the neediness and limited bargaining power of these workers.

This less-than-satisfying state of affairs brings me to a final point:  It is often because family members have determined they are unable to manage an Alzheimer's patient by themselves that they turn to home health care agencies like the one Gregory worked for.  These agencies advertise their credentials and expertise in caring for Alzheimer's patients, and that is a significant part of what the family is buying.  In such service arrangements, the best cost avoider would seem to be the home health care agency.  (Dis. opn., *post*, at p. 2, fn. 1; see generally Calabresi, The Cost of Accidents: A Legal and Economic Analysis (1970).)  As repeat players who hold themselves out as qualified and competent care providers, the agencies are far better positioned than their workers or their clients to assess risks, to devise reasonable safety measures, to provide proper training to caregivers, and to determine whether in-home care is appropriate for a patient in the first instance and on an ongoing basis as a disease progresses.

Given the broad scope of the workers' compensation scheme, which precludes Gregory from suing her employer in tort, courts have limited risk-allocation mechanisms to address the difficult problems this case raises.  I am reluctant to push these problems into the tort system because that approach conceives of cases like this one as private disputes between low-wage workers and ordinary families who are poorly positioned to mitigate risks or absorb the costs of injuries.  What this case really presents is the broader policy issue of how to

4

improve the safety, training, and protection of workers in home caregiving arrangements. Like every member of the court, I believe this issue is worthy of the Legislature's attention.

LIU, J.

**DISSENTING OPINION BY RUBIN, J.**

Tort law ordinarily aims to compensate a person wrongfully injured by another. (See Civ. Code, §§ 1714, subd. (a), 3333; *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550.) Primary assumption of risk departs from that goal. *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761 (*Herrle*), applied primary assumption of risk against a certified nurse's aide working in a convalescent home to deny the aide's recovery of damages from an Alzheimer's patient who struck the aide as the aide was moving the patient from a chair to bed. Embracing *Herrle* as the "case most closely on point" (maj. opn., *ante*, at p. 6), the court's decision today extends primary assumption of risk to appellant Carolyn Gregory, an unlicensed in-home caregiver injured while washing dishes in the home of Bernard and Lorraine Cott. The foundation of the court's holding is that the Cotts hired Gregory to face the risk from Lorraine Cott's Alzheimer's disease that caused Gregory's injury. The majority states: "It is a settled principle that those hired to manage a hazardous condition may not sue their clients for injuries caused by the very risks they were retained to confront." (Maj. opn., *ante*, at p. 1.) Because Bernard Cott hired Gregory to care for Lorraine, it is by the majority's estimation unfair to impose liability on the Cotts if Lorraine injured Gregory while Gregory was delivering such care. (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 542 (*Neighbarger*); maj. opn., *ante*, at p. 4.)

I do not quarrel with the moral blamelessness of defendants—Lorraine Cott, who suffers from sufficiently advanced Alzheimer's disease that she may not

be fully responsible for the injury she caused Gregory (though she remains subject to legal liability under Civ. Code, § 41) and her husband Bernard, who acted in difficult circumstances, to say the least. But Bernard Cott was the competent decision maker who chose in-home care for his wife Lorraine. I believe tort law should align incentives with the consequences of the decisions one makes. Thus, when a family considers the suitability of in-home care for a member suffering from Alzheimer's disease, the law should encourage family members like Bernard Cott to weigh the benefits of in-home care against the costs it may impose on others.[1] The question this case presents is who ought to bear the cost when that decision goes awry? Who ought to bear the risk that a family may guess wrong about the threat one of its members poses because of Alzheimer's disease? The majority answers Gregory should. I do not believe that either the facts or public policy support making in-home caregivers another category of worker, joining firefighters, police officers, and veterinarians, who suffer an unusual restriction, in the guise of primary assumption of risk, of their right to recover from third parties for on-the-job injuries.

 For this reason, I dissent.

---

[1] In an ideal world, professional health care agencies such as the one that employed Gregory would be involved in determining whether institutional or in-home care is better. As repeat players in the field, such agencies presumably have the expertise needed to make the best decision. And as the caregiver's employer, the agency is accountable through its workers' compensation insurance if its decision is incorrect, but the workers' compensation system involves trade-offs for both the employee and employer which result in the employee not likely receiving the same amount of compensation that the employee would receive in an ordinary civil action. In that regard, I agree with the majority that matters involving workers' compensation benefits and other insurance requirements for Alzheimer's families and their caregivers are questions the Legislature ought to take up, because the remedy the court fashions today—which tries to balance the needs of an injured worker not fully compensated for her injuries against a family struggling with the devastating effects of Alzheimer's disease—is imperfect at best.

## I. The Reality of In-home Caregiving for Alzheimer's Patients Does Not Warrant Primary Assumption of Risk

*The Jobsite*

In *Herrle,* the Alzheimer's patient was institutionalized in a convalescent home. Thus, the nurse's aide caring for the patient was in a workplace that her employer governed, with the employer controlling on-the-job safety measures. When safety measures prove inadequate to prevent on-the-job injury, the employer is ordinarily liable to the caregiver under workers' compensation laws. The institutionalized Alzheimer's patient, on the other hand, has little or no liability, but neither does the patient have any control or authority over the workplace. The patient's lack of authority squares with the patient's absence of liability.

A private home is different. There, the family has extensive, if not exclusive, control. The in-home caregiver and her employer, on the other hand, have little control over the workspace. Unlike the dog owner in *Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1129, who boarded his animal at a commercial kennel, a family that hires an aide to care for a family member in the home does not "completely relinquish[] the care, custody, and control" of the person to a "professional" operating in a facility under that professional's full control.

Because family members retain control, family members should likewise retain liability. But the court's decision today weakens the link between control and accountability by relieving the family from needing to be concerned about dangers to the in-home caregiver so long as those dangers arise from the family member's Alzheimer's disease.

*Job Training*

The court supports applying primary assumption of risk to Gregory by noting she had received training in working with Alzheimer's patients, and was therefore better positioned than Bernard Cott to protect herself from Lorraine. But case law does not look to training in other applications of primary assumption of risk. (See *Neighbarger, supra,* 8 Cal.4th at p. 537 [assumption of risk does not

3

consider plaintiff's subjective awareness of risk].) We do not ask whether a firefighter has been trained to fight a particular type of fire before we apply primary assumption of risk. Volunteer firefighters are also subject to the firefighter's rule. (*Baker v. Superior Court* (1982) 129 Cal.App.3d 710, 717–718.) We do not ask whether a veterinarian has worked with a particular breed of dog. And we do not ask whether a recreational athlete knows the rules of the sport.

In any case, the record in this case shows Gregory's training was lacking. In deposition, Gregory answered the question "[W]ere you trained in how to deal with a client suffering from Alzheimer's?" with her reply, "Very much so." But her declaration, which fleshes out her answer, suggests that her "very much so" was in fact very little. Her training consisted of "watching a video and visiting a nursing home with Alzheimer's patients." She had never worked in a nursing home or hospital. She did not have certification as a nurse or nurse's aide, and, having worked only in single-family homes, had never worked under the direct supervision of a registered nurse or health care professional. The lack of supervision from a registered nurse or medical professional continued while she worked for the Cotts. The majority states, "The rule we adopt is limited to professional home health care workers who are trained and employed by an agency." (Maj. opn., *ante*, at p. 14.) If the majority's opinion is founded on the amount of training Gregory received, I suggest the foundation is lacking in this record. Stated differently, if a defendant must establish that a home health caregiver received adequate training before primary assumption of risk is triggered, in this case there is at least a triable issue of fact on that issue, and the trial court should have denied summary judgment.

*The Risk*

Bernard Cott hired Gregory because his wife suffered from Alzheimer's disease, an affliction for which violent outbursts are a foreseeable risk in the disease's later stages. But not every patient with advanced Alzheimer's is violent, and violence is not common during the disease's early stages. Thus, exposure to

4

violence is not inherent in caring for all Alzheimer's patients. Moreover, a number of occupations exist in which practitioners face a foreseeable risk of violence, but the law so far does not apply primary assumption of risk. Psychiatrists, psychologists, family therapists and counselors for at-risk populations face many of the same challenges in their offices as those treating Alzheimer's patients; indeed, some of their clients may even be Alzheimer's patients and their families. The fact an occupation involves some peripheral risks of injury does not in itself justify application of primary assumption of risk to all workers or trainees in that occupation. "[T]he firefighter's rule was not intended to bar recovery for all hazards that are foreseeable in the employment context, but to eliminate the duty of care to a limited class of workers, the need for whose employment arises from certain inevitable risks that threaten the public welfare." (*Neighbarger, supra,* 8 Cal.4th at p. 542; see *Patterson v. Sacramento City Unified School Dist*. (2007) 155 Cal.App.4th 821, 839–842 [primary assumption of risk inapplicable to truck driving trainee injured loading freight on flatbed truck]; but see *Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012, 1016–1017 [primary assumption of risk applies to probation officer injured during self-defense training].)

Courts have been reluctant to extend primary assumption of risk to workers beyond firefighters, police officers, and veterinarians, and even for those occupations courts appear to stretch to avoid applying the doctrine. That reluctance is evident in two Court of Appeal decisions the majority cites with seeming approval. (Maj. opn., *ante*, at p. 17, fn. 9) The first case is *Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658 (*Donohue*), involving a firefighter who slipped on wet stairs while conducting an unannounced fire safety inspection in a building. (*Id.* at p. 660.) The second case is *Kocan v. Garino* (1980) 107 Cal.App.3d 291 (*Kocan*), involving a police officer who leapt over a homeowner's crumbling fence in hot pursuit of a felony suspect who ran onto the homeowner's property. When the officer jumped the fence, it collapsed

because the homeowner had let it fall into a "dilapidated and unsafe condition." (*Id.* at p. 292.)

Both *Donohue* and *Kocan* declined to extend primary assumption of risk to the firefighter and police officer while performing job-related tasks because, by each court's analysis, their injuries were caused by "factors independent of the activity that required" the officer's or firefighter's presence. (Maj. opn., *ante*, at p. 17, italics omitted.) In *Donohue*, the Court of Appeal found primary assumption of risk did not bar the firefighter's lawsuit against the building's owner because the firefighter was in the building to inspect for fire code violations, not to inspect the slipperiness of the stairs, and it was their slipperiness that caused his injury. (*Donohue, supra,* 16 Cal.App.4th at p. 663.) In *Kocan* the trial court sustained the homeowner's demurrer based on primary assumption of risk, but the appellate court reversed, holding the doctrine did not apply because the homeowner's negligence, if any, in letting the fence fall into disrepair did not create the risk that summoned the officer to the homeowner's property. (*Kocan, supra,* 107 Cal.App.3d at pp. 295–296.)

The distinctions drawn in *Donohue* and *Kocan* are thin indeed, but they illustrate the tendency to push back against exempting third parties for liability to workers for on-the-job injuries. But for his occupation, the firefighter in *Donohue* likely would not have been inside the building conducting an unannounced inspection. And but for being a police officer, the officer in *Kocan* likely would not have been chasing a fleeing criminal onto private property by leaping over a homeowner's fence. Both of those public servants were engaged in tasks that were part and parcel of their public duties—a firefighter looking for fire hazards in order to prevent fires, and an officer trying to apprehend a criminal. But even though they were performing tasks involving risks for which the public had hired them, primary assumption of risk did not apply.

But as for Gregory? The majority concludes primary assumption of risk applies because the central reason for her employment by the Cotts—caring for

Lorraine through tasks such as bathing, clothing, and feeding her—also incidentally included washing dishes, which led to her injury. (Maj. opn., *ante*, at p. 16.) But the central reason for a firefighter's employment is fighting fires, and fire safety inspections are intimately tied to fighting fires by preventing them. And the central reason for a police officer's employment is fighting crime, which is intimately tied to capturing fleeing criminals. Here, Gregory's purpose was to provide home health care; it was not to wrestle over a kitchen knife. I do not suggest that primary assumption of risk should have applied in *Donohue* and *Kocan*, but if it does not apply to a police officer in hot pursuit and a firefighter performing a fire safety inspection, then why apply it to a home health care worker washing dishes?

### II. Neither Public Policy nor Judicial Economy nor Availability of Workers' Compensation Insurance Supports Applying Primary Assumption of Risk

*Institutionalization*

The majority concludes the emerging public policy against institutionalization supports applying primary assumption of risk. (Maj. opn., *ante*, at pp. 1, 20–24.) The majority reasons that treating injuries caused by Alzheimer's patients who are institutionalized differently from injuries caused by Alzheimer's patients at home will create an incentive to institutionalize Alzheimer's patients. I believe the majority overstates the public policy favoring deinstitutionalization of Alzheimer's patients. I am also inclined to think the risk of over-institutionalization is speculative.

Public policy leans against *unnecessary* institutionalization. (See, e.g., Health & Saf. Code, § 1727.7.) Sometimes institutionalization may be preferable, or even necessary, especially when risk of physical injury to the patient or others exists. The movement toward deinstitutionalization is a healthy corrective to over-institutionalization in past decades, when many patients suffering mental illness or other disabilities were warehoused and left untreated. In recent years, changing

7

cultural attitudes and the psychopharmacological revolution, which offers for many psychiatric patients effective treatment that permits independent living, have helped sustain the trend toward deinstitutionalization described by the majority. Alzheimer's disease is not, however, a mental illness like depression or schizophrenia, for which treatments exist. Alzheimer's disease physically destroys the brain. Nothing in the record suggests reliable treatment, relief, or cure currently exists. It is a terminal condition inexorably leading to mental incapacity, physical helplessness, and death.

The California Adult Day Health Care Act (Act; Health & Saf. Code, § 1570 et seq.) which the majority cites (maj. opn., *ante*, at p. 23) expresses a policy preference for minimizing institutionalization of the elderly and disabled. I agree society should avoid institutionalization when better alternatives are available. By promoting community-based adult day care, the Act advances that commendable goal. But promoting alternatives to institutionalization does not mean institutionalization is to be avoided at all costs. Nor does that goal address how society ought to allocate tort liability for injuries caused by Alzheimer's patients who are not institutionalized. For even if it is salutary not to institutionalize, I do not believe that desirable result should be subsidized on the backs of low-paid in-home caregivers. By dissenting, I do not intend to encourage or discourage institutionalization. Rather, I suggest we encourage those who decide to provide in-home care for a family member with Alzheimer's to take into account the true costs of their decision, which includes a risk of injury to caregivers.

Despite urging that we structure tort law to encourage families to take into account the risk of injury to others in deciding how to care for a family member with Alzheimer's, I do not believe we would see a rush toward institutionalization. Choosing to move a family member suffering from Alzheimer's disease to an institutional setting is fraught for most families. For many, the decision will touch upon matters such as family history, cultural traditions, intergenerational

8

obligations, and emotion. Affordability will also play a role, as will the physical demands of caring for someone in decline. I am inclined to think that for most families, questions of liability will be among the least of concerns. Thus, I believe that the worry about creating an incentive to over-institutionalize if we do not extend primary assumption of risk to in-home care is at best speculative.

*Judicial Economy*

Primary assumption of risk has the virtue of allowing its expeditious application by trial courts, often by summary judgment. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [assumption of risk a legal question amenable to summary judgment].) The majority opinion observes that "[w]hether a duty of care [under primary assumption of risk] is owed in a particular context depends on considerations of public policy, viewed in light of the nature of the activity and the relationship of the parties to the activity. (*Neighbarger*, *supra*, 8 Cal.4th at p. 541; *Knight*, at pp. 314–315.)" (Maj. opn., *ante*, p. 4.) In short, whether a duty is owed depends on the job and the risk: a firefighter fighting a fire, for instance. (*Neighbarger,* at p. 538.) The doctrine is founded on an absence of factual disputes.

The majority states its rule is "limited to professional home health care workers who are trained and employed by an agency." (Maj. opn., *ante*, at p. 14.) Likewise, according to the majority, primary assumption of risk does not apply in the absence of a suitable warning. (*Id.* at p. 2.) Factual disputes about warnings and training likely will remove many of these cases from resolution by summary judgment.

The majority also excludes from its holding cases "where the cause of injury is unrelated to the symptoms of the disease." (Maj. opn., *ante*, at p. 2.) Patients in the early stages of Alzheimer's disease ordinarily do not exhibit violent outbursts or have trouble controlling themselves. (See maj. opn., *ante,* at p. 10, fns. 3–5 [collecting authorities]; see also, Alzheimer's Association, *Seven Stages of Alzheimers* <http://www.alz.org/alzheimers_disease_stages_of_alzheimers.asp>

9

[as of Aug. 4, 2014] [behavioral changes may be noticeable in stage 6].) Accordingly, society should not give such patients a "free pass" to act out by extending primary assumption of risk to them in their dealings with caregivers. Rightfully, the majority does not suggest that injuries caused by anger, fear, or annoyance at a level that we all experience are immunized from liability simply because a patient is at the early stages of Alzheimer's disease. But determining whether a patient's injurious conduct is related to the patient's Alzheimer's disease requires trial courts to delve into evidence of the stage of illness an Alzheimer's patient has reached in order to determine whether a patient is no longer responsible for his or her conduct. At some point, primary assumption of risk will apply, but what is that point? Does not that inquiry undermine part of the utility of the doctrine of primary assumption of risk?

For Alzheimer's patients, I imagine a continuum. For example, in the case of a doctor punched during an in-hospital physical exam by an Alzheimer's patient, a trial court could apply *Herrle* and the majority's decision today to find primary assumption of risk. On the other hand, the opinion suggests a trial court should reject primary assumption of risk when an Alzheimer's patient living at home gets into a car and injures a stranger by causing a car accident. (Maj. opn., *ante*, at p. 7, quoting *Herrle, supra,* 45 Cal.App.4th at p. 1766.) Where ought non medically licensed in-home caregivers like Gregory and patients more competent than Lorraine Cott fit on that continuum? Their relationships are more than that of a stranger in the car accident, but less than a doctor examining a patient in a hospital. But how much more and how much less? And how does a trial court measure the risks attendant to in-home care, compared to, say, performing a physical exam or driving a car? When Lorraine assaulted Gregory, Gregory was engaged in less than providing medical care but in more than socializing. In needing to address these other factors to determine where interactions between caregiver and patient fall on the continuum, a trial court's analysis begins to look more like secondary assumption of risk, if not in name, then in substance. And by

10

needing to consider these other factors, the judicial economy of primary assumption of risk disappears.

I posit two situations: In the first, the Alzheimer's patient is in the early stage of the disease, cantankerous perhaps but not apparently violent, and the family's comments about disruptive behavior are vague. The caregiver is minimally trained. In the second, the patient has a long history of violence, the caregiver has years of training and experience and is plainly warned of the patient's past conduct. The majority holds that the second scenario fits squarely within the primary assumption doctrine, but the opinion also suggests that the first scenario does not. I see this dichotomy as a marked departure from the well-established primary assumption of risk rules we have for firefighters, police officers, veterinarians and sports enthusiasts. These contrasting scenarios are more suitable for resolution in the context of secondary assumption of risk, which as the majority observes is adjudicated under the rules of comparative negligence. (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068; *Knight v. Jewett, supra,* 3 Cal.4th at pp. 314–315.)

*Workers' Compensation Insurance*

Both the majority opinion and Justice Liu's concurrence assume that the workers' compensation system, at least in part, will help mitigate the consequences of subjecting Alzheimer's caregivers to primary assumption of risk. (Maj. opn., *ante,* at p. 24; conc. opn., *ante,* at p. 4.) This evidently is true in the present case, as the agency has workers' compensation coverage that Gregory has been receiving. (Maj. opn., *ante,* at p. 2.) But I envision several situations in which a caregiver will not be covered by workers' compensation, and primary assumption of risk will bar any recovery for injuries of the type Gregory suffered, thus denying the caregiver any remedy for those injuries.

First of all, the agency here apparently has acknowledged Gregory is an employee rather than an independent contractor. Had Gregory been an independent contractor she would not have been entitled to workers' compensation

11

benefits. (Lab. Code, §§ 3351, 3353, 3600, 3700.) Whether a worker is characterized as an employee or an independent contractor is a frequent subject of litigation both under workers' compensation law (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 [workers' compensation laws extend "only to injuries suffered by an 'employee' "]) and with respect to other employee benefits (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, ___ [173 Cal.Rptr.3d 332, 338–346 [wage and hour protections]). In light of the "infinite variety of service arrangements," (*Borello*, at p. 350) whether any particular home health caregiver is an employee or an independent contractor is not susceptible to categorical determination. Under today's ruling, the agency-provided home caregiver who is an independent contractor is barred from suing for injuries under the primary assumption of risk, and pursuant to long established principles he or she is denied workers' compensation benefits as well.[2]

Situations also are likely to arise in which the caregiver is legally considered an employee but the agency does not have workers' compensation insurance. Under the Labor Code, if an employer fails to have workers' compensation coverage, the employee "may bring an action at law against such employer for damages, as if this division did not apply." (Lab. Code, § 3706; see *Valdez v. Himmelfarb* (2006) 144 Cal.App.4th 1261, 1268.) Under the majority

---

[2] Whether a home health care worker is an independent contractor rather than an employee presents more than an abstract inquiry. The Employment Agency, Employment Counseling, and Job Listing Services Act (Civ. Code, § 1812.500 et seq.) sets forth the circumstances under which a domestic worker is not an employee of the referring agency for purposes of workers' compensation laws. (Civ. Code, § 1812.5095, subds. (a), (f).) Compliance with the statute exempts the agency "from state law requirements of maintaining worker's compensation insurance for the domestic workers." (*An Independent Home Support Service, Inc. v. Superior Court* (2006) 145 Cal.App.4th 1418, 1421 [provider of caregivers typically for an elderly or infirm member].)

12

opinion, presumably in those situations a suit against the patient/employer is still barred by primary assumption of risk. Would not the same rule applying primary assumption of risk preclude an action against the agency? And even if the agency could not take advantage of today's ruling, what would its liability be in such a situation? Unless the agency were in some way negligent, the only viable claim would be against the patient or the family, which is now barred.

As a third example, I observe that the majority limits its holding to those workers "who are trained and employed by an agency," and expressly disclaims any consideration of "the policy implications of claims by other hired caregivers." (Maj. opn., *ante,* at p. 14, & fn. 8.) Presumably the disclaimer refers to caregivers who are hired directly by the family and not through a home health care agency. In my view, however, the employing entity is largely irrelevant to today's analysis. If the independent caregiver is trained to care for Alzheimer's patients, is warned about the patient's possible aggressive behavior, and the disease has sufficiently progressed—the criteria for the majority's application of primary assumption of risk—primary assumption of risk seemingly would bar the independent caregiver from suing the patient or the patient's family even if the latter is the employer. Just as the majority is unwilling to distinguish the institutional caregiver in *Herrle* from the present agency-provided home caregiver, I doubt it would be willing to draw the line between the agency-provided home caregiver and one not hired through an agency. Workers' compensation benefits might be available if the independent caregiver is considered an employee (and not an independent contractor) and the patient and family have workers' compensation coverage. But lacking such coverage, even though Labor Code section 3706 grants an employee the right to sue, for the home caregiver that right would be quashed by application of primary assumption of risk.

For these reasons, I do not believe that the potential for workers' compensation benefits provides doctrinal support for the majority's extension of primary assumption of risk to a new class of workers.

13

**III. Conclusion**

This is a hard case involving sad facts. As the majority notes, the Legislature and society at large may be well served by turning their attention to the problems associated with caring for Alzheimer's patients. Whatever the solutions to those problems, I do not believe they should be at the expense of in-home caregivers who risk a physical injury by working on the front line, typically for low pay and few benefits. Accordingly, I respectfully dissent.

**RUBIN J.**[*]

**I CONCUR:**

**WERDEGAR, J.**

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Gregory v. Cott
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 213 Cal.App.4th 41
**Rehearing Granted**

_____

**Opinion No.** S209125
**Date Filed:** August 4, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Gerald Rosenberg

_____

**Counsel:**

Alexander J. Petale for Plaintiff and Appellant.

Laurel R. Webb and Matthew Stark Blumin for SEIU United Long Term Care Workers and United Domestic Workers, AFSCME Local 3930, AFL-CIO as Amici Curiae on behalf of Plaintiff and Appellant.

Reed Smith, Margaret M. Grignon, Tillman J. Breckenridge; Inglis Ledbetter Gower & Warriner, Richard S. Gower and Gregory J. Bramlage for Defendants and Respondents.

McGuire Coats and Wendy McGuire Coats for Vaughn E. James as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alexander J. Petale
Post Office Box 3993
Hollywood, CA  90078
(323) 240-3894

Matthew Stark Blumin
American Federation of State, County, and Municipal Employees
1101 17th St. NW, Suite 900
Washington, D.C . 20010
(202) 775-5900

Margaret M. Grignon
Reed Smith
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071-1514
(213) 457-8000